FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 3 1 2010



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| 1524948 ALBERTA LTD., an Alberta, Canada corporation d/b/a Terra Marketing Group,<br><br>Plaintiff,<br><br>vs.<br><br>AMANDA LEE, an individual; JOHN DOES 1 through 50, real names unknown, the owner(s), proprietor(s), and/or author(s) of the website known as "pennyauctionwatch.com,"<br><br>Defendants. | CASE NO. 10·CV-2735<br><br>**COMPLAINT FOR FALSE ADVERTISING, TRADEMARK INFRINGEMENT, TRADE LIBEL, DEFAMATION, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP, NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONSHIP, AND TORTIOUS INTERFERENCE WITH POTENTIAL BUSINESS RELATIONS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff 1524948 Alberta Ltd., d/b/a Terra Marketing Group ("Plaintiff" or "Terra Marketing"), through its attorneys, alleges as follows:

## Introduction

1.     One of the fastest-growing and most widely practiced forms of commercial sabotage today is the "fake gripe site." A "fake gripe site" is a website that purports to be a neutral or consumer-oriented online forum for the exchange of

1

information about a particular industry sector or business, but which in reality is just a tool for dishonest businesses and persons to disseminate false and damaging statements about a competitor. A fake gripe site is engineered to attract a large number of viewers through the manipulation of keywords and other information (including the trademarks and service marks of the competitor targeted by the site) embedded in its own source code and text, with the goal of boosting the fake gripe site's relevance in searches through Google and other online search engines and thereby placing the fake gripe site higher in the list of search results returned when a user searches for the competitor's name or mark. When the user clicks on the search result and goes to the fake gripe site, he or she will encounter a rash of false and defamatory "reviews" about the competitor that were not prepared by actual consumers, but rather by the proprietor of the fake gripe site in an effort to damage the reputation and business of the competitor. A fake gripe site often earns revenue from the sales of advertising space to other members of the owner's industry, who are also often in competition with the target of the fake gripe site. Therefore, by using the target's own name and marks against it in an illegal and infringing way, the fake gripe site manages to spread lies about the target, thus damaging its reputation and, ultimately, its business.

2.     Plaintiff Terra Marketing has recently become a victim of one of these fake gripe sites. Terra Marketing owns and operates a "penny auction" site called

SwipeBids.com, where consumers can bid on and purchase consumer goods and services at deep discounts from ordinary retail prices. The SwipeBids site has become perhaps the preeminent and most successful penny auction sites in the world, and its business model has become a paragon for the online penny auction industry. SwipeBids, however, has been defamed through a series of false and outlandish statements published on a fake gripe site known as "pennyauctionwatch.com" ("PAW"), which is hosted at that domain name and owned, operated, and authored by Amanda Lee and possibly by other unknown persons and/or entities named herein as "John Doe" defendants 1 through 50. PAW, like most gripe sites, uses Terra Marketing's SwipeBids mark illegally to attract readers through Google and other searches; contains false and defamatory statements about the SwipeBids penny auction site; and collects revenue through the posting of banner ads, sponsored search results, and other advertisements for penny auction sites in competition with SwipeBids. Notably absent from PAW and the message board thereon, however, are any *positive* reviews or other information about SwipeBids or any advertisements for SwipeBids.

3.     The true and obvious nature of PAW, therefore, is not that of a neutral or consumer-friendly forum for the exchange of information about an industry's participants, or even just a single one of those participants. Rather, PAW is nothing more than a vehicle for one or more competitors of Plaintiff to use in their

3

sustained and purposely directed smear campaign against SwipeBids, and to drive consumers and revenue to their own sites advertised on the PAW site. This is an illegal infringement and misuse of Terra Marketing's protected marks and creative material of the highest order.

4.    PAW is a bane to many in the online auction industry, as PAW has inflicted great harm on many online auction websites through PAW's self-interested attacks, most of which are false and defamatory. As a leader in the online auction industry, Terra Marketing and Swipebids bring this action seeking remedies for the significant damages PAW has caused, including $6 million in actual damages and at least $12 million in punitive damages.

5.    This action seeks damages and other remedies against Amanda Lee and the other persons and entities responsible for the PAW website and message board under causes of action for false advertising under 15 U.S.C. §1125(a)(1)(B) (Count I), unauthorized use and infringement of Plaintiff's SwipeBids and SwipeBids.com service marks under 15 U.S.C. §1125(a) (Count II), trade libel under 15 U.S.C. §1125(a) (Count III), defamation under Georgia common law (Count IV), intentional interference with contractual relationships under Georgia common law (Count V), negligent interference with contractual relationships under Georgia common law (Count VI), and tortious interference with potential business relations under Georgia common law (Count VII), all arising from the operation by

4

Defendants of the PAW website and message board.  Because the location of Amanda Lee is not currently known, and because the true identities of the other responsible parties are not currently known, Terra Marketing is entitled to discovery from domain name registrars and other sources in order to obtain contact information for Amanda Lee and the true names of the Doe defendants, and will amend this Complaint to allege those names more fully.

### Jurisdiction and Venue

6.     This Court has subject matter jurisdiction over the three claims arising under federal law (Counts I through III) under 28 U.S.C. §1331 and 28 U.S.C. §1338(a) and (b).  This Court additionally has supplemental jurisdiction over the Georgia common law claims (Counts IV through VII) under 28 U.S.C. §1367.

7.     This Court has personal jurisdiction over Defendants Amanda Lee and John Does 1 through 50 ("Defendants"), each of whom acted individually and as a possible sole proprietor, partner, or joint venture partner with the other Defendants in operating the website "PAW" and its message board because all claims for relief in this action against said Defendant or Defendants arise from their doing one or more of the following acts under O.C.G.A. §9-10-91:

(a)     Transacting business within Georgia;

(b)     Committing a tortious act or omission within Georgia, with the

exception of causes of action for defamation of character arising from

the act; or

(c)     Committing a tortious injury in Georgia caused by an act or omission

outside Georgia and regularly doing or soliciting business, or

engaging in another persistent course of conduct, or deriving

substantial revenue from goods used or consumed or services

rendered in Georgia.

8.     Venue is proper in this Court for each claim for relief pursuant to 28

U.S.C. §1391(b) either because each Defendant is located in this District, or

because a substantial part of the events or omissions giving rise to each claim

occurred in this District.

### Plaintiff Terra Marketing

9.     Plaintiff 1524948 Alberta Ltd., d/b/a Terra Marketing Group, is a

corporation organized and existing under the laws of the Province of Alberta,

Canada and maintains its principal place of business in Calgary, Alberta, Canada.

Plaintiff has continuously used and conducted business under the mark

"SwipeBids" since December 2009.  Plaintiff is in the business of operating an

online penny auction site at the Internet address www.swipebids.com.

**Defendants Amanda Lee and John Does 1 through 50**

10.   Defendant Amanda Lee is an individual residing in the State of Minnesota, but her exact location in Minnesota is unknown to Plaintiff.   On information and belief, Defendants John Does 1 through 50 are, along with Defendant Amanda Lee (collectively, "Defendants"), the principal owners, operators, and primary content providers of PAW.   At all relevant times or portions thereof, Defendants operated PAW and its message board under the domain name www.pennyauctionwatch.com and did so either as a sole proprietor or as a partner or joint venture partner of the other Defendants.    Defendants are the primary decision maker or makers for PAW, overseeing both the day-to-day operations of the website and message board, as well as the long-term plans therefor. Defendants have personally authored, published, re-published, and/or edited more than 65,000 purported opinions, comments, and criticisms on PAW and its message board.   Defendants are thus inextricably intertwined with the operation and function of PAW.

11.   Defendants have purposefully availed themselves of the benefits of conducting business in Georgia by marketing, selling, or brokering products to Georgia residents, entering into transactions from Georgia residents, earning revenues from Georgia residents, and entering into and/or conducting transactions through PAW and/or advertisements thereon, some of which are from advertisers

such as Wavee, which is located in Alpharetta, Georgia. Defendants have also caused harm to Plaintiff in Georgia by reason of the fact that Plaintiff's credit card processor, First Data, which is located in Atlanta, Georgia, canceled its contract with Plaintiff because of the false and defamatory statements spread by Defendants on PAW about Plaintiff and SwipeBids and alleged "bot bidding" (explained *infra*), resulting in over $6 million in damages to Plaintiff. Defendants also offer a message board on the website that purports to be interactive and invites consumers, including Georgia residents, to post comments and complaints about penny auction sites on PAW (which, as explained further herein, are limited on that website to negative comments if about SwipeBids). Defendants have encouraged users, including Georgia residents, of PAW to avoid using SwipeBids, and to patronize the penny auction sites and companies whose advertisements appear on, and are solicited by, PAW.

12.     Defendants John Doe 1 through 50 include but are not limited to individual contributors to PAW whose names and identities are presently unknown to Plaintiff. Plaintiff will amend this Complaint to allege the names and identities of said Defendants when they become known.

### The Common Enterprise of Defendants

13.     Defendants have aided and abetted and conspired with each other to operate PAW and to perpetrate the wrongful and tortious actions alleged herein.

8

14.    Whenever reference is made in this Complaint to any act of any Defendant, that allegation shall be deemed to mean the act of such Defendant acting individually and jointly, and as the owner, officer, director, employee, agent, joint venturer or representative of each remaining individual Defendant or of PAW and the enterprise carried on through said website, acting within the course and scope of such owner, officer, director, employee, agent, joint venturer or representative relationship, and with the advance knowledge, acquiescence, or subsequent ratification of each and every remaining Defendant.

### Plaintiff's Business and Marks

15.    Terra Marketing is the owner and operator of the SwipeBids.com website, which is an online auction facility that allows users to register and participate in auctions for consumer goods at typically substantial discounts from ordinary retail prices.  Terra Marketing has operated SwipeBids continuously since December 2009.  To market the SwipeBids online auction site, Terra Marketing has invested heavily in its service mark SwipeBids (the "Mark").  Terra Marketing has continuously used and conducted business under the Mark in interstate and international commerce since December 2009, and has advertised in connection with the Mark throughout the country and the world, principally through advertising on the Internet.

16.     Through Terra Marketing's continuous and exclusive use of the Mark, the Mark has acquired secondary meaning and goodwill as consumers have come to associate the Mark with Terra Marketing and its services.

17.     Since Terra Marketing began using the Mark, Terra Marketing's services sold in connection with the Mark have generated millions of dollars in revenue.  Terra Marketing has devoted and continues to devote considerable time, effort, and money in promoting and marketing its services offered in connection with the Mark.

18.     Terra Marketing has filed an application with the United States Patent and Trademark Office for the registration of the Mark (Serial No. 85078953).  As of the filing of this Complaint, that application was still pending.

## Defendants' Business and Unlawful Activities

19.     Defendants operate PAW, which purports to be a website and message board oriented toward consumer protection and information regarding penny auction sites.  The portrayal of PAW as a consumer protection website is simply a marketing gimmick.  In reality, Defendants generate revenues from PAW by selling advertising space on the website to other penny auction site operators and third party affiliates that pay Defendants a percentage of sales generated from consumers who click on links from Defendants' website to the affiliates' websites to make purchases or otherwise participate in the other penny auction sites.

20.    To market PAW and attract viewers and consumers to that site, Defendants integrate Plaintiff's Mark and those of other third party trademarks and trade names of penny auction websites, located throughout the United States and elsewhere, into the PAW website and other online sites such as Defendants' PAW-related Facebook page. Defendants then engage in a tactic commonly referred to as "search engine spam," where Defendants use the Mark and other third party trademarks to cause search engines, like Google, to index pages for Defendants' website in such search engines.  As a result, when consumers put the Mark into Google's search engine, Google lists Defendants' website as one of the top search results.  Consumers then view and click on links to Defendants' website.

21.    In order to draw in consumers, Defendants strategically place Plaintiff's Mark, along with other third party penny auction trademarks, within key parts of the HTML files for PAW and Defendants' Facebook page. Defendants then use their "search engine spam" technique to get PAW and the Facebook page indexed in search engines when consumers search for the Plaintiff's Mark or other third party penny auction trademarks. Regarding just the Google search engine, Google indexes over 400 web pages on PAW into which Defendants have inserted Plaintiff's Mark. As a result, consumers searching on Google—or other search engines—for Plaintiff, are led to PAW.

11

22.   These "search engine spam" techniques used by Defendants have confused consumers searching for Plaintiff and Plaintiff's Mark. Further, when consumers visit PAW, Defendants falsely lead consumers to believe that the website is a consumer-protection website providing information to help consumers choose penny auction websites, when, in fact, the website is nothing more than a commercial website with the primary purpose of generating revenue by exploiting the trademarks of hundreds of penny auctions nationwide.   The following screenshots show examples of how Defendants have placed defamatory and infringing statements about Plaintiff and Plaintiff's Mark alongside advertisements for other penny auction sites on PAW:





23.    Defendants have populated the PAW website and message board with

false and defamatory materials about Plaintiff, in particular that Plaintiff engages

in "bot bidding."  "Bot bidding" is a technique sometimes used by unscrupulous

auction site operators to artificially boost the range of bid prices on particular

items.  The operator will execute a program (called a "bot") that will automatically

enter a "shill" bid on an item if the existing bids are not as high as the operator

desires, in the hopes that legitimate bidders will be impelled to enter even higher

bids to try to "win" the item.  "Bot bidding" is considered extremely dishonest in

the penny auction industry because it creates false impressions about the value of

items on online auctions, and because it puts legitimate bidders at a disadvantage in their bidding strategies and reduces their chances of obtaining the items they have bid upon at the prices that are being bid. In fact, "bot bidding" is fraudulent. Accordingly, an accusation that a penny auction site engages in "bot bidding" is extraordinarily damaging and defamatory to that site and its operator, since consumers will naturally be less likely to patronize a penny auction site that is thought to engage in "bot bidding."

24.   Plaintiff does not engage in bot bidding on the SwipeBids site, and never has. However, Defendants have made express and implied statements on PAW and its message board in which they, or other persons whose comments and statements have been procured, encouraged, edited, republished, and/or adopted by Defendants, have claimed that Plaintiff does engage in bot bidding on the SwipeBids site. In fact, a great portion of the comments and information published on PAW and its message board relates to Defendants' accusations that Plaintiff engages in such bot bidding on SwipeBids. Defendants' website and message board contains numerous commentaries and statements which are intended by Defendants to create the impression that Plaintiff engages in "bot bidding" at SwipeBids.com, and republishes or otherwise adopts the statements of other purported consumers and visitors to PAW as the opinion and statements of

14

Defendants.   Defendants couch blatantly defamatory statements in terms of opinion, when in fact they are intended as statements of fact.

25.   An example of one such statement appeared on PAW in May 2010, personally posted by Amanda Lee, under a heading stating "Please note: All of these statements are our opinions: Why if SwipeBids.com didn't have bot bidders are there only limits placed on the $10 Wal-Mart gift cards?  This is not to suggest that they do have bot bidders, they say they don't[,] *just something seems amiss, in our opinion.*" (Emphasis added.)  That statement is followed by "Take a look at some (from the many) comments from our readers indicating that they have **only** been able to win $10 Wal-Mart cards:" which is followed in turn by these statements (all of which are reprinted verbatim):

- "I think those $10 cards and bid packs are the only things real humans can win on SwipeBids.  Right now, there is an IPod that is worth $249 that is being bid on and the cost is now $350.   (35,000 bids!) What???"

- *Another reader tells us,* "I won plaenty of things, 2 Macbooks, a Cannon Camera, HTC unlocked phone, tons of smaller items.  All I have received is BS from their telephone support and one empty package."

- *And another,* "I have won 85 $ 10 dollar wal mart chards and 1 xbox and a mouse and other small items and I have only receved 6 walmart cards when I try to as where is the rest I get told tech difficulties this site is a scam dont play they will play you and take your money and charge your credit card I have wasted over $600.00 playing and they have scamed me"

- *There are many, many more unhappy customers,* "Yes,I am also a victim of swipebids. Not one time, but twice. My first encounter was well over a month ago. Taken for $150.00 when I was only looking to try their $1.00 trial package. You know just check out the site. Then, maybe go further. They took it upon themselves to go and change my $1.00 trial, to a $150.00 package. They are nothing but straight up thieves, and liars. Well, checking my account today I saw that swipebids paid me a visit. Stole from me once again. Not as much this time, THIEVES. I will do whatever it takes to put a stop to their taking freely from me ever again. Hopefully, from anyone else also. How dare they!!!"

- *One more,* "SwipeBids Will make sure their workers place bids against you until your money or Bid pack is gone Don't matter How many you buy. * * * "

26.     These statements were followed by text reading "**See more comments on Swipebids** and also see the <u>red flags section of our penny auction forum</u>." The underlined text contained hyperlinks to other pages on PAW and its message board that contained further defamatory and false statements about Plaintiff and SwipeBids.

27.     Defendants' defamatory statements about Plaintiff and SwipeBids have not been limited to claims of "bot bidding" and other such practices, however. The sum total of Defendants' actionable statements about Plaintiff and SwipeBids on PAW are far too numerous to include in this Complaint. However, by way of illustration, another posting on PAW in May 2010 carried the headline "SwipeBids.com's Twitter Points to Jesse Willms – Canada" and contained a

16

photo from a Canadian television report that linked Jesse Willms to alleged deceptive online commerce practices. The posting incorporated and repeated a number of false and defamatory statements made in the report about Mr. Willms and companies with which Mr. Willms was alleged to have been involved, and adopted those statements as those of Defendants. The posting went on to state that "Yesterday morning we found Swipebids.com's Twitter account *http://www.twitter.com/swipebids*" and claimed that "Just yesterday, and more today, SwipeBids posted links to many Wordpress hosted blogs, some (obvious shilled blogs) claim to be from customers, others are official SwipeBids' blogs. If you take a look at the bottom of most of these blogs you'll see the blog's authors username: **jessewillms**britneyspears & **jessewillms**amazon". The implication of those latter statements is that Defendants are trying to tie Mr. Willms and his alleged practices as falsely claimed by the Canadian television report to SwipeBids, and that Defendants are attempting to damage SwipeBids and Plaintiff through those false and unfavorable references and inferences.

28.     Defendants' defamatory and otherwise actionable statements about Plaintiff and SwipeBids have been wanton and without any regard for the truth, and, in fact, were motivated by Defendants' desire to profit from those statements.

29.     Defendants have profited mightily from their defamatory and false statements about SwipeBids and their illegal and infringing use of Plaintiff's Mark

have been profitable for Defendants. When consumers land on the PAW website and message board as a result of searches for Plaintiff's Marks or other third party trademarks, Defendants take every opportunity to direct consumers a) to the Defendants' own products, like the PAW "bid packs" that are associated with PAW's sponsors, and b) to companies affiliated with Defendants that pay Defendants fees in return for advertising on the PAW website. These directions are accomplished by Defendants through the use of Google Adsense ads, buttons, banners ads, and other paid advertisements for other penny auction websites, and through the crafting of custom promotions whereby PAW can give away "bid packs" to its customers, which can be used on the websites of PAW's sponsors – resulting in fees being paid to PAW. Thus, not only are Defendants assisting in unfair competition against Plaintiff, but Defendants themselves are in direct competition with Plaintiff.

### The PAW Message Board

30.     In addition to maintaining the PAW website where infringing and defamatory material about Plaintiff and Plaintiff's Mark appears, Defendants also maintain an online message board where Defendants personally make frequent defamatory postings about Plaintiff and Plaintiff's Mark, and where Defendants encourage visitors to post comments about penny auction sites, including Plaintiff's SwipeBids.com. To date, the message board has well over 65,000

postings, an untold number of which contain false and unfavorable mentions of Plaintiff and/or Plaintiff's Mark, and many of which are indexed in the Google search engine.

31.   Defendants use the PAW message board as another way to attract consumers who are searching for information about penny auction sites. Defendants seek to profit from such consumers when they arrive at the PAW website through the message board.

32.   Each Defendant is individually active on the PAW message board, and Defendants have published multiple statements accusing Plaintiff of fraud and offering to direct consumers to alternatives to the Plaintiff. Defendants create the illusion that the message board is populated primarily with the posts of consumers; however, most of the postings are from the Defendants themselves and are made by Defendants under multiple fictitious user names.

33.   On the message board, Defendants publish comments and opinions intended to steer consumers away from SwipeBids and toward online penny auction sites that are affiliated with the advertisers on PAW.

34.   On information and belief, Defendants have never posted negative comments or opinions, or allowed negative comments or opinions to be posted, on the message board about the advertising affiliates of PAW.

35.    Defendants admit in "disclaimers" on the PAW website that they are operating the PAW website and message board for profit and with the support of affiliates who advertise other penny auction sites on the PAW website.

36.    As a result, Defendants are information content providers on the PAW message board, in that each Defendant is responsible, in whole or in part, for the creation or development of information published on the message board that is false, misleading, confusing and/or defamatory.

37.    Additionally, Plaintiff entered into business relationships, and could reasonably expect to enter into business relationships, with multiple specific and identifiable consumers by, among other things, such customers arriving at the Swipebids.com home page in response to marketing, and providing such consumers bid packs on SwipeBids.com in response to online transactions at SwipeBids.com by those consumers. Such business relationships afforded Plaintiff prospective legal rights vis-à-vis such consumers. On information and belief, Defendants, on multiple occasions, gained knowledge of the aforementioned business relationships and prospective business relationships of Plaintiff with multiple consumers. Thereafter, on information and belief, Defendants intentionally interfered with Plaintiff's aforementioned business relationships and prospective business relationships with those consumers by, among other unjustified actions, providing false and defamatory information to such consumers

20

and encouraging such consumers not to enter contracts with Plaintiff, and inducing those consumers to purchase bid packs and other goods and services from the affiliates that advertise on Defendants' PAW website. Defendants also interfere with SwipeBids' relationship with its merchant bank, First Data, which suspended SwipeBids' merchant account because of Defendants' false and defamatory accusations of "bot bidding" on the SwipeBids.com site.

### Plaintiff's Damages

38. Plaintiff has suffered over $6 million in damages as a consequence of Defendants' actions. The online penny auction industry is growing dramatically in North America, and consumers often visit and patronize multiple penny auction sites and purchase bid packs and other goods and services from more than one site. The affiliates who advertise on PAW, and from whom Defendants profit, are competitors of Plaintiff. Additionally, many consumers conducting Internet searches for Plaintiff, for SwipeBids, or for penny auction sites in general, eventually end up on Defendants' PAW website and message board. As a result, hundreds if not thousands of customers have chosen not to do business with Plaintiff as a direct result of Defendants' website and message board and the false and defamatory material thereon, resulting in damages that exceed $1 million. Furthermore, Plaintiff suffered at least $5 million in damages as a result of First

Data terminating its contract with Plaintiff due to PAW's false allegations of "bot bidding."

## Count I

## False Advertising Under Section 43(a) of the Lanham Act, 15 U.S.C. §1125

39.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-38.

40.     By engaging in the above-described activities, Defendants have made, or knowingly conspired and agreed to be made, false and misleading representations of fact in commercial promotions or advertising which misrepresent the nature, characteristics, qualities, or geographic origin of Defendants' and Plaintiff's goods, services, or commercial activities, all in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B).

41.     As a direct and proximate result of the actions, conduct, and practices of Defendants alleged above, Plaintiff has been damaged and will continue to be damaged.

42.     Plaintiff has no adequate remedy at law.

//

//

//

## Count II

## Infringement of an Unregistered Trademark and Federal Unfair Competition Comprising False and Misleading Statements of Fact Under Section 43(a) of the Lanham Act, 15 U.S.C. §1125

43.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-42.

44.     Plaintiff possesses common law trademark rights for the trademark SwipeBids.

45.     As a result of Plaintiff's marketing and promotion, the trademark SwipeBids has come to signify Plaintiff as a preeminent and high quality online penny auction proprietor.

46.     On information and belief, Defendants' actions to integrate Plaintiff's SwipeBids trademark into Internet web pages, include the insertion thereof into metadata on those web pages, violate Plaintiff's common law rights in its trademark SwipeBids.

47.     On information and belief, Defendants' actions, in commerce, to entice Internet consumers to Defendants' PAW website and message board through the use of Plaintiff's SwipeBids trademark are likely to cause confusion or mistake, or to deceive as to the affiliation, connection, or association of the Defendants' goods and services with Plaintiff or Plaintiff's SwipeBids trademark;

or as to the origin, sponsorship, or approval of the Defendants' goods, services, and commercial activities by Plaintiff under the SwipeBids trademark.

48.     Defendants' continued use of the SwipeBids trademark without the prior authorization of Plaintiff infringes Plaintiff's exclusive rights in that trademark and constitutes violations of Section 43 of the Lanham Trademark Act, 15 U.S.C. §1125(a). Defendants' actions as described above have also caused and are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Plaintiff's goods, services, or commercial activities by Plaintiff, and thus constitute false designations of origin, passing off, and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A).

49.     Defendants have committed the acts alleged above with the previous knowledge of Plaintiff's use and superior rights to the SwipeBids trademark. Further, Defendants' actions were for the willful and calculated purpose of trading upon Plaintiff's goodwill and for the willful and calculated purpose of misleading and deceiving purchasers and the public with an intent to reap the benefit of the SwipeBids trademark.

50.     By reason of Defendants' acts of false designation as alleged above, Plaintiff has suffered, and will continue to suffer, substantial damage to its

business reputation and goodwill, as well as diversion of trade and loss of profits in an amount not yet ascertained.  Plaintiff is entitled to damages in an amount that will be ascertained according to proof pursuant to 15 U.S.C. §1117.

51.    Defendants' acts alleged above have caused and will cause irreparable harm to Plaintiff for which Plaintiff has no adequate remedy at law in that:  (i) if Defendants' wrongful conduct continues, consumers are likely to become further confused about the nature of Plaintiff's services; (ii) Plaintiff's SwipeBids trademark is a unique intellectual property, which has no readily determinable value; (iii) the infringement by Defendants constitutes an interference with Plaintiff's goodwill and customer relationships; and (iv) Defendants' wrongful conduct, and the damages resulting to Plaintiff, is continuing.  Plaintiff is entitled to injunctive relief pursuant to 15 U.S.C. §1116(a).

52.    Plaintiff is also entitled to recover its attorneys' fees and costs of suit from Defendants pursuant to 15 U.S.C. §1117.

## Count III

## Trade Libel Under Section 43(a) of the Lanham Act, 15 USC §1125(a)

53.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-52.

54.    The statements and representations made by Defendants of and concerning Plaintiff to Defendants' customers and readers of Defendants' PAW

website and message board included, but were not limited to, advertising, publishing, disseminating and communicating false and misleading statements and unfounded misrepresentations about the business, goodwill, and reputation of Plaintiff.

55.    The aforementioned false statements and representations of and concerning Plaintiff were published, disseminated, or otherwise communicated by Defendants.

56.    The aforementioned false statements and representations made by Defendants of and concerning Plaintiff were published, disseminated, or otherwise communicated by Defendants across state borders and in interstate commerce.

57.    The aforementioned false statements and representations made by Defendants of and concerning Plaintiff were statements and representations of a commercial nature and constituted commercial speech since they were published, disseminated, or otherwise communicated with the intent of increasing Defendants' advertising and other revenue on Defendants' PAW website and message board, and/or decreasing Plaintiff's sales.

58.    As a direct and proximate result of Defendant's conduct as alleged herein, Plaintiff is entitled to recover damages from Defendants in an amount to be determined at trial.

## Count IV

## Defamation – Georgia Common Law

59.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-54.

60.     Defendants' actions as described above constitute defamation, in that:

(a)     Defendants have made, or knowingly conspired and agreed to be made, false statements regarding Plaintiff, identified and rebutted in detail in the above paragraphs, incorporated herein by reference as though listed here;

(b)     Defendants' statements constitute defamation per se, in that they defame Plaintiff in its trade;

(c)     Defendants knew or should have known that the statements published were false;

(d)     Defendants published these statements to various third parties without privilege; and

(e)     Defendants refused to retract and/or correct those statements despite demand for such retraction and/or correction having been made by Plaintiff to Defendants.

61.    As a proximate result of the foregoing acts, Defendants have caused actual harm to Plaintiff and are liable to Plaintiff for damages in an amount to be proven at trial.

62.    Defendants have engaged in conduct of an oppressive, fraudulent, and malicious nature, thereby entitling Plaintiff to an award of punitive damages.

63.    As a direct and proximate result of the actions, conduct, and practices of Defendants alleged above, Plaintiff has been damaged and will continue to be damaged.

64.    Plaintiff has no adequate remedy at law.

## Count V

## Intentional Interference with Contractual Relationships

65.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-64.

66.    The aforesaid acts of Defendants constitute intentional interference with Plaintiff's contractual relationships.   Specifically, Plaintiff entered into business relationships with multiple specific and identifiable consumers, which afforded Plaintiff prospective legal rights vis-à-vis such consumers.   Plaintiff had also entered into a contractual relationship with First Data for credit card processing services for transactions entered into on or through the SwipeBids.com website.

28

67.     Defendants, on multiple occasions, gained knowledge of the aforementioned business relationships of Plaintiff with multiple consumers and with First Data.

68.     Thereafter Defendants intentionally interfered with Plaintiff's aforementioned business relationships by, among other unjustified actions, providing false and defamatory information (including without limitation the accusation that Plaintiff had engaged in bot bidding on the SwipeBids.com website) and encouraging consumers not to enter contracts with Plaintiff.

69.     As a direct and proximate result of Defendants' false and defamatory statements about Plaintiff, identifiable consumers of Plaintiff's services and goods terminated their contractual relationships with Plaintiff.   Also as a direct and proximate result of Defendants' false and defamatory statements about Plaintiff, First Data terminated its credit card processing contract with Plaintiff, resulting in damages of over $5 million.

70.     As a direct and proximate result of Defendants' acts, Plaintiff has suffered, and will continue to suffer, damages and irreparable harm.

71.     Plaintiff has no adequate remedy at law.

//

//

//

## Count VI

## Negligent Interference with Contractual Relationships

72.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-71.

73.     The aforesaid acts of Defendants constitute negligent interference with Plaintiff's contractual relationships.   Specifically, Plaintiff entered into business relationships with multiple specific and identifiable consumers, which afforded Plaintiff prospective legal rights vis-à-vis such consumers.  Plaintiff had also entered into a contractual relationship with First Data for credit card processing services for transactions entered into on or through the SwipeBids.com website.

74.     Defendants, on multiple occasions, gained knowledge of the aforementioned business relationships of Plaintiff with multiple consumers and with First Data.

75.     Thereafter Defendants negligently interfered with Plaintiff's aforementioned business relationships by, among other unjustified actions, providing false and defamatory information (including without limitation the accusation that Plaintiff had engaged in bot bidding on the SwipeBids.com website) and encouraging consumers not to enter contracts with Plaintiff.

76.   As a direct and proximate result of Defendants' false and defamatory statements about Plaintiff, identifiable consumers of Plaintiff's services and goods terminated their contractual relationships with Plaintiff.   Also as a direct and proximate result of Defendants' false and defamatory statements about Plaintiff, First Data terminated its credit card processing contract with Plaintiff, resulting in damages of over $5 million.

77.   As a direct and proximate result of Defendants' acts, Plaintiff has suffered, and will continue to suffer, damages and irreparable harm.

78.   Plaintiff has no adequate remedy at law.

### Count VII

### Tortious Interference with Potential Business Relations

79.   Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1-78.

80.   The aforesaid acts of Defendants constitute tortious interference with Plaintiff's potential business relations.   Specifically, as the operator of one of the premier penny auction sites in North America, Plaintiff could reasonably have expected that it would have entered into business relations with multiple consumers who ultimately declined to purchase goods and services from Plaintiff as a result of the defamatory and wrongful statements and misrepresentations made by Defendants as described above.

81.     Said statements and misrepresentations by Defendants, and the other conduct of Defendants as alleged above, were wrongful and made and performed without privilege to do so.

82.     Said statements and misrepresentations by Defendants, and the other conduct of Defendants as alleged above, were wrongful and made and performed purposely and with malice with the intent to injure Plaintiff.

83.     As a direct and proximate result of Defendants' false and defamatory statements about Plaintiff, identifiable consumers of Plaintiff's services and goods, as well as First Data, were induced to terminate their contractual relationships with Plaintiff, and/or were caused to discontinue or fail to enter into an anticipated business relationship with Plaintiff.

84.     As a direct and proximate result of Defendants' acts, Plaintiff has suffered, and will continue to suffer, damages and irreparable harm.

85.     Plaintiff has no adequate remedy at law.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

1. As to Counts I through III:

    a. That the Court enter a judgment against Defendants that they have made false and misleading representations of fact in commercial advertising, all in violation of 15 U.S.C. §1125(a).

b. That the Court enter a judgment against Defendants that they have infringed and are infringing Plaintiff's common law trademarks pursuant to 15 U.S.C. §1125(a);

c. That the Court enter a judgment against Defendants that they have committed trade libel against Plaintiff, in violation of 15 U.S.C. §1125(a).

d. That the Court issue injunctive relief against Defendants, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendants, enjoining and restraining them from:

   i. Using in any manner the SwipeBids trademark, or other trademarks of Plaintiff, alone or in combination with any other words or symbols, or any foreign derivatives or equivalents that are likely to cause confusion, deception or mistake, on or in connection with the advertising, offering for sale, or sale of any product or service that is not Plaintiff's or not authorized by Plaintiff to be sold in connection with these trademarks.

33

ii. Engaging in any other activity constituting an infringement of Plaintiff's trademarks, including the trademark SwipeBids, or of Plaintiff's rights in, or right to use or to exploit said trademarks.

e. That the Court order Defendants to pay Plaintiff's general, special, and actual and statutory damages as follows:

f. Plaintiff's damages and Defendants' profits pursuant to 15 U.S.C. §1117(a).

g. Such other damages as the Court shall deem to be within the provisions of the Lanham Act, as amended;

h. Interest, including prejudgment interest, on the foregoing sums.

i. That the Court order Defendants to pay to Plaintiff both the costs of this action and the reasonable attorneys' fees incurred by it in prosecuting this action.

j. Such other further relief to which Plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

2. As to Counts IV through VII:

a. Plaintiff's compensatory damages in an amount according to proof, but not less than $5 million;

b. Punitive damages in an amount equal to the greater of two times actual damages or $10 million;

c. An order for a public apology and retraction by the Defendants responsible for the acts alleged herein, to be disseminated as Plaintiff sees fit;

d. That the Court order Defendants to pay to Plaintiff both the costs of this action and the reasonable attorneys' fees incurred by it in prosecuting this action; and

e. Such other further relief to which Plaintiff may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Dated the 26 of August, 2010.

Respectfully submitted,

By: _____
Karl S. Kronenberger
Georgia Bar No. 429898

Attorneys for Plaintiff
1524948 ALBERTA LTD., d/b/a Terra
Marketing Group

KRONENBERGER BURGOYNE LLP
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
Email: Karl@KBInternetLaw.com

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests that this case be tried by a jury as to all issues triable by a jury.

Dated the 26 of August, 2010.          Respectfully submitted,

By:

Karl S. Kronenberger
Georgia Bar No. 429898

Attorneys for Plaintiff
1524948 ALBERTA LTD., d/b/a Terra
Marketing Group

KRONENBERGER BURGOYNE LLP
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
Email: Karl@KBInternetLaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, the attached pleading complies with the font

and point selections prescribed by Local Rule 5.1B and uses 14 point Times New

Roman Font.

Dated the 26 of August, 2010.          Respectfully submitted,

By: _____
     Karl S. Kronenberger
     Georgia Bar No. 429898

Attorneys for Plaintiff
1524948 ALBERTA LTD., d/b/a Terra
Marketing Group

KRONENBERGER BURGOYNE LLP
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
Email: Karl@KBInternetLaw.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| 1524948 ALBERTA LTD., an Alberta, Canada corporation d/b/a Terra Marketing Group,<br><br>                    Plaintiff,<br><br>vs.<br><br>AMANDA LEE, an individual; JOHN DOES 1 through 50, real names unknown, the owner(s), proprietor(s), and/or author(s) of the website known as "pennyauctionwatch.com,"<br><br>                    Defendants. | CASE NO. _____<br><br><br>**PLAINTIFF 1524948 ALBERTA LTD.'S CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT** |

Pursuant to Civil Local Rule 7.1-1, Plaintiff 1524948 Alberta Ltd., d/b/a Terra Marketing Group ("Plaintiff") hereby submits its Certificate of Interested Parties and Corporate Disclosure Statement.

(1)    The undersigned counsel of record for Plaintiff certifies that the following is a full and complete list of all parties in this action, including any parent corporation and any publicly held corporation that owns 10% or more of the stock of a party:

1

As of this date, other than the named parties, there is no such interest to report.

(2)    The undersigned further certifies that the following is a full and complete list of all other persons, associations, firms, partnerships, or corporations having either a financial interest in or other interest which could be substantially affected by the outcome of this particular case:

As of this date, other than the named parties, there is no such interest to report.

(3)    The undersigned further certifies that the following is a full and complete list of all persons serving as attorneys for Plaintiff in this proceeding:

Karl S. Kronenberger (Georgia Bar No. 429898)
KRONENBERGER BURGOYNE LLP
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone: (415) 955-1155
Facsimile: (415) 955-1158
Karl@KBInternetLaw.com

Dated the 26 of August, 2010.                  Respectfully submitted,

By: _____
        Karl S. Kronenberger
        Georgia Bar No. 429898

        Attorneys for Plaintiff
        1524948 ALBERTA LTD., d/b/a Terra
        Marketing Group

2

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, the attached pleading complies with the font

and point selections prescribed by Local Rule 5.1B and uses 14 point Times New

Roman Font.

Dated the 26 of August, 2010.       Respectfully submitted,

By: _____
    Karl S. Kronenberger
    Georgia Bar No. 429898

Attorneys for Plaintiff
1524948 ALBERTA LTD., d/b/a Terra
Marketing Group

3